THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRAN-
KLIN BURCHETTE, Defendant-Appellant.

First District (3rd Division)   No. 1—90—0591

Opinion filed December 29, 1993.—Rehearing denied February 9, 1994.

Michael J. Pelletier, Alan D. Goldberg, and Charles Hoffman, all of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Michelle Katz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a jury trial, defendant, Franklin Burchette, was convicted on three counts of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) and sentenced to natural life in the Illinois Department of Corrections. Defendant now appeals. We affirm.

The issues for review by this court are (1) whether defendant was afforded effective assistance of counsel on the basis that he did not receive conflict-free representation (i) because he filed a disciplinary complaint against defense counsel which created a conflict of interest, and (ii) because defense counsel was employed on a part-time basis as a village prosecutor in noncriminal cases; (2) whether defendant received ineffective assistance of counsel when defense counsel failed to call certain witnesses to testify at the hearing on the motion to quash arrest and suppress evidence; (3) whether the trial court erred in denying defendant's motion to reopen a hearing on his motion to quash arrest and suppress evidence; (4) whether defendant received ineffective assistance of counsel when defense counsel failed to move

for reconsideration of the trial court's denial of defendant's motion to quash arrest and suppress evidence; (5) whether defendant was denied a speedy trial under section 103—5(a) of the Code of Criminal Procedure of 1963 (Speedy Trial Act) (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(a)); (6) whether defendant received ineffective assistance of counsel when defense counsel failed to file a motion for a discharge under section 103—5(a) of the Speedy Trial Act (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(a)); (7) whether defendant was denied his right to be present at a critical stage of the proceedings; (8) whether defendant waived his right to testify; (9) whether defendant received ineffective assistance of counsel when defense counsel (i) stated that he was not sure what the evidence would prove and that he did not know what his witnesses would say, (ii) elicited hearsay testimony and made improper remarks during trial, and (iii) failed to object to hearsay testimony elicited from defendant's father by the State regarding an inculpatory statement allegedly made by defendant to his mother; (10) whether defendant was prejudiced when the State moved for a directed finding in the presence of the jury; (11) whether defendant received ineffective assistance of counsel when defense counsel (i) failed to ask the jury to find defendant "not guilty" during the defense's closing argument, and (ii) failed to tender Illinois Pattern Jury Instructions, Criminal, No. 2.04 (Illinois Pattern Jury Instructions, Criminal, No. 2.04 (2d ed. 1981) (hereinafter IPI Criminal 2d)); and (12) whether the trial court erred in failing to appoint new counsel to represent defendant on his post-trial allegations of ineffective assistance of counsel.

On May 18, 1984, Angela Burchette decided to leave her husband, defendant. Angela called her mother, Matilda Franks, and asked for assistance. Angela's brother, Robert Anthony Franks, and her sister, Delois Daniel, responded. Franks and Daniel helped Angela and her two children move out of her residence with defendant and into her mother's home. Defendant tried to stop Angela from leaving but Robert prevented him from compelling her and the children to stay.

Angela's sisters, Felicia Franks and Delois Daniel, along with Delois' three children Shamar, Robert (Robbie) and Latoisha (Toby), were living at 7701 South Kingston in Chicago, Illinois. On the morning of May 23, 1984, the telephone rang at the Franks-Daniel residence between 8:30 and 9 a.m. Felicia answered the telephone. Defendant was calling and he asked Felicia why she was at home. Felicia and Delois usually left home for work early in the morning between 5 a.m. and 5:45 a.m. Felicia told defendant that she was not at work because she had a doctor's appointment. Defendant then hung up.

Between 10:30 and 11 a.m., on that same day, defendant called Matilda Franks' house. Angela's brother Robert answered the telephone. Defendant asked to speak to Angela, but Robert told him that Angela did not want to speak to him. Between 5 p.m. and 5:30 p.m., defendant arrived at Matilda's home and asked her if Angela would be willing to speak with him. Matilda walked away and talked to Angela and then returned to speak to defendant. Matilda told defendant that Angela was still unwilling to speak with him, but that Angela wanted to get a layaway ticket from him and that she wanted to go back to their home and retrieve her children's clothes and her television set. Defendant left.

At approximately 7 p.m. on that same day, defendant called Delois again and told her that he wanted to talk with Angela and convince her to return to him. Delois told defendant that she "didn't have anything to do with it and that it was between them."

On the following morning, May 24, 1984, Delois and Felicia woke up early as usual and left for work. Shamar, Robbie and Toby were still asleep when the women left for work. Shamar owned a small black and white television and Robbie owned a baseball bat which was kept in a corner of a room. Delois returned home at about 5:30 p.m. that evening. When no one answered the doorbell, she walked around to the back door whereupon she noticed that the window had been knocked out. In addition to the broken back door window, the telephone was broken and Shamar's television was gone. Delois called her children's names but received no answer. She then discovered that Shamar, Robbie and Toby were all dead. Robbie was lying facedown on a bed with a blanket over him in the children's room. Toby was lying on the floor in the same room next to a second bed with a blanket wrapped around her. Shamar was in Delois' bedroom covered by a bloodstained blanket. The headboard on Delois' bed and the wall above it were splattered with blood. A piece of wire and a piece of wood were both recovered from Delois' bed by the police. Dr. Robert Stein, the Cook County medical examiner, testified that all of the children died as a result of cerebral injuries sustained from blunt trauma to the brain.

Interviews of family members by the police led them to seek defendant for questioning. Detectives Michael Rowan and James O'Rourke, along with Sergeant John Manos, went to defendant's apartment at 5112 South May, in Chicago, Illinois. The police officers initially spoke to defendant's sisters. Detective Rowan testified that while he was speaking to defendant's sisters, defendant approached the policemen and asked them if they wished to speak to him. The detectives asked defendant if he would be willing to assist them in

their investigation of the children's deaths. Defendant replied that he "would be glad to," and he accompanied the police to the Area 2 police headquarters. While at the police station, defendant signed a consent to search form for both his car and his home, and he gave the police his house keys.

The police recovered wire from defendant's car and apartment. The wire from Delois' bed matched the piece of wire found in defendant's apartment, the two pieces having originally been one complete piece. The piece of wood later tested positive for human blood. In addition, blood found on defendant's pants was tested and found to be consistent with Shamar's blood, which was type A, a type common to only 25 in 100,000 people. It was also scientifically determined that the blood could not have come from defendant.

While defendant was at Area 2 headquarters, he made a number of statements to the police. Initially, defendant denied any involvement in the murder, claiming that he was with his cousin, Willie Allen, all day on the date in question and that the red spot on his pants was ketchup and not blood. Defendant then admitted his involvement but refused to relate details unless permitted to speak to Angela first. Angela was then brought to Area 2 headquarters, where she spoke with defendant.

After defendant spoke to Angela, Detectives Joseph Digiacomo and John Solecki interviewed defendant, at which time he told the detectives that he set up what he thought would be "just" a burglary and that he gave a "junkie" the keys to Delois' apartment so that the junkie could steal a television set. Defendant claimed that the junkie was supposed to go to the apartment after 9 a.m. when the children would be in school, get the television and then leave after which he and the junkie would split the proceeds of the sale of the television. Defendant told police that the junkie told him that he had to kill the children and that he exchanged clothes with the junkie which is how the ketchup, now acknowledged to be blood, ended up on his pants. The detectives indicated that they were skeptical of defendant's story, at which time defendant rendered still another version of the events.

This time, defendant claimed that he went to Delois' apartment with "Dwayne" and that when they got there Robbie awakened and saw Dwayne. Defendant maintained that when Robbie awakened he told Dwayne "don't worry," but that Dwayne struck Robbie with the baseball bat while defendant was stealing the television set, and that Dwayne also went into another room where he struck Shamar and Toby with the bat. Defendant claimed that he then drove Dwayne through Washington Park whereupon he saw blood on the bat and he threw the bat away. The bat was never recovered by the police.

The detectives then questioned Angela about Dwayne but she stated that she had never heard of him. The detectives returned to confront defendant with this fact, at which time defendant changed his previous story. Defendant related the following facts to the police. Defendant told the police that he arose early and went to Delois' apartment. When he arrived there, he found that the girls were up. Defendant told the girls that he was there to pick up some cosmetics for their mother, who was outside in a car. The girls got dressed and went outside to look for their mother, at which time defendant picked up a bat and hit Robbie in the head, carried him into the bedroom, put him in bed and covered him up with a blanket. When the girls returned, they told him that they could not find their mother, and defendant told them that she must have left. Shamar went to Delois' room to watch television. Defendant then hit Toby in the head with the bat. Toby fell to the floor, and Shamar returned to defendant to find out what had happened. Defendant told her that Toby "fell out," and he and Shamar carried Toby to the rear bedroom. Shamar later asked defendant, "[y]ou're not going to hurt me, are you?" and defendant responded by attempting to strike her with the bat. Shamar ran to her mother's bed, jumped under the covers and begged defendant not to kill her. Defendant responded to Shamar's plea by beating her with the bat. He then left the apartment, drove through Jackson Park, and threw the bat out of the window into the park upon noticing blood on it. Defendant subsequently went to his mother's house. Defendant told the detectives that he brought a wire strand to the apartment with him and that he found the bat in the corner of a room.

After defendant made his confession, Assistant State's Attorney Dane Cleven interviewed him. Defendant gave Assistant State's Attorney Cleven the same account as last given to the police; however, he provided additional details. Defendant told Assistant State's Attorney Cleven that Shamar said she loved him and would not tell anyone what he had done and he stated that he struck Toby again with the bat after striking Shamar. Defendant also said that he had an extension cord in his pocket which he had previously cut up, that he took the cord out while in the apartment, but that he picked up most of the pieces, taking them with him when he left the apartment. This statement was reduced to handwritten form by Assistant State's Attorney Cleven and corrected by the defendant; however, after defendant corrected the statement, he refused to sign it.

Defendant was initially represented by Edward Byrd. Byrd withdrew as counsel on August 16, 1984, at which time a public de-

fender was appointed to represent defendant. Assistant Public Defender Adrienne McFall filed an appearance on September 19, 1984. On October 17, McFall filed a motion to withdraw. Attorney Richard Martin filed an appearance on October 31, 1984.

Martin subsequently filed several pretrial motions, including a motion to quash arrest and suppress evidence and a motion to suppress statements. On December 2 and 3, 1985, testimony was heard on these motions. During the hearing, Sergeant Manos, Detective Solecki and Sergeant Rutherford Wilson testified for the State and a stipulation regarding the testimony of Detective DiGiacomo was also heard by the court. The aforementioned police officers maintained that defendant had willingly accompanied the detectives to the police station, that he was not arrested at his mother's house or immediately upon arrival at the police station and that he was not handcuffed at his mother's house or immediately upon his arrival at the police station.

Defendant testified in his own behalf. Regarding the motion to quash arrest and suppress evidence, defendant testified that the police told him that he was not under arrest when he first saw them and accompanied them to Area 2 headquarters. He testified under oath: "No. No, didn't no one threaten me when I first got there because I was under the impression that I was not under arrest, that I was just there to be questioned and I was going to be released." In his sworn affidavit in support of the motion to suppress statements, defendant acknowledges:

"2. Police detectives, whose identities are unknown, told [defendant] that he was *not* under arrest.
***
4. [Defendant] agreed to go and went in an unmarked police car." (Emphasis in original.)

In fact, defendant's only reference to handcuffs was his testimony that around 11:30 p.m. or 12 a.m., he was handcuffed to a wall after the police noticed that he had blood on his pants. Defendant admitted signing "something"; however, he maintained that he did not know that it was a consent to search form.

With respect to the motion to suppress statements, defendant testified that he initially told the police that he spilled ketchup on his pants and denied being in the area of the crime. Defendant claimed that the police never read him his *Miranda* rights, denied him sleep, displayed an electric prodder, threatened him, called him names, denied him an attorney after he requested one and told him that he was crazy, sick, and needed help.

After the hearing, the court made the following finding:

"The motion to suppress the statements, the confession and the statements will be denied. I think this evidence has established clearly and convincingly [that] they were voluntarily given without coercion or duress. The motion to quash arrest will likewise be denied. [B]oth parties agree the defendant was not under arrest when he left 51st and South May, he went to the police station. Some time later after the accumulation of evidence to show probable cause, he was placed under arrest, so both motions will be denied."

After the motions were denied, defendant executed a jury waiver for purposes of sentencing. The court accepted the waiver over the State's objection. The State then filed a motion to reconsider, which was denied. Thereafter, the State filed a petition for an original writ of *mandamus*. The case was continued on the State's motion from December 3, 1985, until January 31, 1986. The supreme court entered the following order on the *mandamus* petition on January 29, 1986:

"Motion by petitioner to stay the trial court proceedings in the Circuit Court of Cook County, Case No. 84—C—6487, pending disposition of the petition for an original writ of mandamus. Motion *allowed.*" *People ex rel. Daley v. Carey* (1986), 487 N.E.2d 623, 623.

Defendant, at this time stated: "I want to object to what the State is asking, I would like to be put on record that I am objecting to it." Attorney Martin then stated: "Keep in mind that the supreme court will be the ultimate body to rule on any objection you make, and the supreme court is the body that has granted a stay to this fourth term situation, the State has been granted as to the stay, do you understand what a stay is?" Defendant indicated that he understood and wished to file his own interlocutory appeal on the issue. On July 18, 1986, a mandate of the supreme court denying the petition for a writ of *mandamus* was issued.

While awaiting the ruling from the supreme court, Martin filed several motions on March 6, 1985. He filed a motion to set bail, a motion to reconsider the court's ruling on the motion to suppress statements and a motion to reconsider the court's ruling on the motion to quash arrest and suppress evidence.

In a letter dated April 14, 1986, defendant wrote to the trial judge requesting the dismissal of Martin as defense counsel. Defendant complained: "I feel that he has not been acting in the best interest of my behalf and that he has proven to be incompetent as for the way he has been handling my case, so if you would accept this motion and grant it for me, I feel that I can find someone who will perhaps do a lot better job at handling my case and the proper defense tactics that are necessary for a better and fairer trial." On

April 17, 1986, defendant filed a complaint with the Attorney Registration and Disciplinary Commission (ARDC), alleging that Martin was "trying to lose the case deliberately," not treating his case as a priority, failing to have a defense strategy and missing court dates. He further claimed that Martin failed to object to the stay during the pendency of the *mandamus* petition, failed to call witnesses to testify on his behalf at the motions, and refused to accept defendant's telephone calls or appoint an investigator.

The court made the following ruling and statement:

"Well, you are going to have to stay on the case. Mr. Burchette didn't get along with the public defender and you were appointed. You were appointed by me but through the chief judge's office and one of the bar associations. I have nothing to do personally with your selection. But, Mr. Burchette, you are either just going to have to get along with this attorney. You don't want to go *pro se*, but Mr. Martin is your attorney, and he's been appointed, and I am not going to switch around at this late date for trial. Your case is going to be tried immediately after we get the decision on the *mandamus*, and it should be coming down any day now."

On May 23, 1986, defendant filed a motion for appointment of a counselor other than the public defender. Defendant alleged that communication had broken down between himself and Martin, that Martin had failed to send "appropriate investigators to interview witnesses for defendant's defense," that defendant was being denied effective assistance of counsel because Martin did not confer with defendant and that Martin did not permit him to participate in his defense.

On that same day, Martin filed his response with the ARDC. The ARDC concluded that "a formal disciplinary prosecution would not succeed" and took no action against Martin.

On June 9, 1986, defendant filed again what was essentially a motion for a new attorney, alleging lack of communication. The court noted that it had already ruled on the motion for appointment of counsel and stated that it would not change attorneys at such a late date.

On July 30, 1986, Martin argued motions to reconsider the denial of the motion to quash arrest and suppress evidence and the motion to suppress statements. With regard to the motion to suppress statements, Martin requested leave to present additional testimony from the defendant as well as one other witness. The court, noting that it had already heard defendant testify in a lengthy hearing, ruled that it would not rehear the motion. With respect to the motion to suppress statements, the court held, as it had earlier, that the "facts show the confession was voluntary."

Several witnesses testified for defendant including defendant's cousin, Willie Lee Allen; defendant's father, Franklin Burchette, Sr.; Anthony Wright; Myrna Hardy; Debra Miller; Annette Burchette, defendant's sister; Annette Watson, defendant's sister-in-law; and defendant's brother, Charles Burchette. Most of the witnesses testified regarding the question of whether or not defendant was handcuffed or arrested at the time he left home and accompanied the police. Allen testified that he had been with defendant since 6:30 a.m. on May 24, 1984, and that the two men spent the entire day together. He testified that defendant was taken out of his mother's house in handcuffs.

Franklin Burchette, Sr., testified that his son told him that he had not committed the murders, but that the police pressured him into confessing to the crimes. On cross-examination, however, he admitted that defendant's mother told him that defendant confessed to her over the telephone.

Anthony Wright, Myrna Hardy, Debra Miller and Annette Burchette all testified that defendant was taken out in handcuffs.

Annette Watson, defendant's sister-in-law, testified that defendant was in her basement at 5112 South May in Chicago, Illinois, between 6:30 and 7 a.m. on May 24, 1984. She also testified that he was not handcuffed when she later saw him, although after repeated questioning she admitted that she did not see him leave with the police.

Defendant's brother, Charles Burchette, testified that he also saw defendant around 6 a.m. on the morning of May 24, 1984, in his house at 5112 South May. He testified, however, that he saw defendant handcuffed on the street.

Defense counsel, in his closing argument, argued that Angela's mother has wrongly targeted defendant because she was hostile towards him in general and that defendant was mistreated by the police. He also asked the jury to deliver a fair verdict.

A jury instruction conference was held on August 7, 1986. At that time, the State tendered all proposed instructions. Each instruction was discussed among the parties on the record and with the trial judge present. Subsequently, the court tendered the instructions to the jury.

On August 7, 1986, the jury found defendant guilty of the murders of Shamar, Robbie and Toby Franks. Defendant filed a post-trial motion, contending, among other things, that the court had failed to tender IPI Criminal 2d No. 2.04 (IPI Criminal 2d No. 2.04), despite a request that said instruction be given. The court stated that there was no such request on the record.

On September 12, 1986, the date of the sentencing, defendant presented a motion for a new trial based on ineffective assistance of counsel. The court found that there was "[n]othing in what Martin did or failed to do that would change the outcome of the trial." The court subsequently sentenced defendant to death.

Defendant was given leave to file a post-sentencing motion. The motion requested that defendant's sentence either be reduced to natural life, that he be given a new sentencing hearing, or that the court grant an evidentiary claim on ineffective assistance of counsel at sentencing. Defendant asserted, for the first time, that when deciding whether or not to testify at trial, he was told by defense counsel that if he did not testify, the jury would be instructed by the court that his failure to testify could not be construed against him and that he decided not to testify based in part on the representation that the jury would be so instructed.

The trial court held that it was compelled as a matter of law to grant defendant a new sentencing hearing because of the use of a victim impact statement at sentencing and because a new attorney should have been appointed to represent defendant at sentencing when he alleged ineffective assistance of counsel. The court then sentenced defendant to a term of natural life in prison.

Defendant contends that he received ineffective assistance of counsel on the basis that he did not receive conflict-free representation because he filed a disciplinary complaint against defense counsel which created a conflict of interest and because defense counsel was employed on a part-time basis as a village prosecutor. We disagree.

The standard for the sufficiency and quality of an attorney's advocacy is that of reasonably effective assistance pursuant to prevailing professional norms. (*Strickland v. Washington* (1984), 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693-94, 104 S. Ct. 2052, 2064-65.) In order for a defendant to prove that he received ineffective assistance from counsel sufficiently ineffective to warrant the reversal of his conviction, the defendant must demonstrate that his counsel made errors so grave and that his counsel's performance was so deficient that counsel did not function in a manner commensurate with the sixth amendment standard for legal representation. *(Strickland,* 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) In order to establish that defense counsel was deficient, a defendant must overcome the strong presumption that the disputed action or inaction by defense counsel was merely trial strategy. (*Strickland,* 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.) A review of a lawyer's competency will not extend to the exercise of his judgment, discretion, trial tactics and trial strategy. (*People v. Sowinski* (1984),

148 Ill. App. 3d 231, 246, 498 N.E.2d 650, 659.) Even if a defendant is able to overcome the presumption that a disputed action or inaction was defense counsel's trial strategy and establish that his attorney's performance was deficient, he must still demonstrate that he was prejudiced by defense counsel's error (*Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65), and that there was a reasonable probability that but for said error, the fact finder would have had a reasonable doubt concerning his guilt. *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.

A narrow exception to the *Strickland* standard exists where a defendant asserts a claim arising under the right to conflict-free counsel. (*Strickland*, 466 U.S. at 692, 80 L. Ed. 2d at 696, 104 S. Ct. at 2067.) The existence of a *per se* conflict of interest or a conflict of interest arising from joint or multiple representation amounts to reversible error. A *per se* conflict arises when a defense attorney has a prior or contemporaneous association either with the prosecution or prosecution witnesses. (*People v. Spreitzer* (1988), 123 Ill. 2d 1, 14, 525 N.E.2d 30, 34.) A *per se* conflict is evidenced by a connection with either a person or an entity which would benefit from an unfavorable verdict for the defendant. (*Spreitzer*, 123 Ill. 2d at 16, 525 N.E.2d at 35; see also *People v. Holmes* (1990), 141 Ill. 2d 204, 218-20, 565 N.E.2d 950, 956-57.) Hence, in such cases, unlike cases governed by *Strickland*, the defendant need not show prejudice since prejudice is presumed from the very nature of the conflict. *Spreitzer*, 123 Ill. 2d at 15, 525 N.E.2d at 35.

A second type of conflict of interest may arise when counsel is involved in joint or multiple representation. An accused has the right to the undivided loyalty of his counsel and the right to representation free from conflicting interests. In cases where there is an alleged conflict of interest due to joint or multiple representation, courts have employed two distinct lines of analysis, whose utilization depends upon when the issue is raised. If counsel brings the conflict to the attention of the trial court at an early stage, the court has a duty to either appoint separate counsel or ascertain whether the risk to defendant's interest is too remote to warrant separate counsel. (*Spreitzer*, 123 Ill. 2d at 17-18, 525 N.E.2d at 36; see also *Holloway v. Arkansas* (1978), 435 U.S. 475, 481-87, 55 L. Ed. 2d 426, 432-36, 98 S. Ct. 1173, 1177-80.) When the trial court is not apprised of the potential conflict, the defendant must demonstrate the existence of an actual conflict which adversely affected counsel's performance. *Spreitzer*, 123 Ill. 2d at 18, 525 N.E.2d at 36; see also *Cuyler v. Sullivan* (1980), 446 U.S. 335, 348-50, 64 L. Ed. 2d 333, 346-48, 100 S. Ct. 1708, 1718-19.

In the present case, defendant claims that he was denied effective assistance of counsel because the disciplinary complaint, taken in conjunction with what he perceives to be an admission by defense counsel of defense counsel's inability to exercise independent professional judgment, constitutes either a *per se* conflict or an actual conflict which manifested itself at trial. Defendant's claims must fail, however, as he employs a conflict of interest analysis which is the wrong standard of review.

■ The filing of a complaint with the ARDC does not create a *per se* conflict of interest. (*People v. Allen* (1991), 220 Ill. App. 3d 772, 784-85, 580 N.E.2d 1291, 1300.) Courts are reluctant to permit the application of anything other than a *Strickland* analysis when a defendant's claim of ineffective assistance of counsel is premised upon an ARDC complaint. *People v. Szabo* (1991), 144 Ill. 2d 525, 529-31, 582 N.E.2d 173, 174-76.

Furthermore, the record does not corroborate the existence of a potential conflict brought to the attention of the trial court. There is no specific reference to the ARDC complaint. Defendant's complaint was evidence of nothing more than a "personality clash" between defendant and his attorney. We cannot equate a "personality clash" with a conflict or potential conflict of interest. (See *People v. Coleman* (1990), 203 Ill. App. 3d 83, 99, 560 N.E.2d 991, 1002.) Defendant's claims merely amounted to a disagreement over trial tactics and personal conflicts resulting from differences of opinion between him and defense counsel.

Defendant also contends that defense counsel's status as a village prosecutor in civil cases for a few hours once a week created a *per se* conflict of interest requiring reversal of his conviction. We disagree.

Defendant relies upon the case of *People v. Fife* (1979), 76 Ill. 2d 418, 392 N.E.2d 1345, in support of his allegation. In *Fife,* the Attorney General's internal code of conduct restricted special assistant Attorney General from representing criminal defendants without a specially granted exception from the Attorney General. It is the opinion of this court that the *Fife* ruling applies only to situations in which counsel is appointed by a prosecutorial body. Defense counsel in the present case was appointed by the court. *Fife,* therefore, is not applicable to the question of whether defense counsel's employment as a village prosecutor created a *per se* conflict of interest in the present case.

There is no *per se* conflict as defense counsel's work on civil village cases is insufficient to warrant reversal of this criminal case on conflict of interest grounds. Defense counsel's work as a village prosecutor does not amount to a contemporaneous association with

the prosecution or prosecution witnesses, as defense counsel's association with the village does not constitute a nexus to an entity that would benefit from an unfavorable verdict against defendant and there is no evidence that defense counsel had prior associations with the prosecutor or the prosecution witnesses.

■ Defendant also alleges that he received ineffective assistance of counsel when defense counsel failed to call certain witnesses to testify at the hearing on the motion to quash arrest and suppress evidence. Defendant maintains that said witnesses would have testified that defendant was handcuffed when he initially encountered the police.

The record shows that defendant, in his motion to quash arrest and suppress evidence, did not allege that he was either arrested or handcuffed by the police prior to accompanying them to the station. In addition, defendant's own affidavit directly negates his claim that he was under arrest:

"2. Police detectives, whose identities are unknown, told [defendant] that he was *not* under arrest.

\*\*\*

4. [Defendant] agreed to go and went in an unmarked police car." (Emphasis in original.)

Furthermore, defendant's testimony at the hearing was consistent with both the motion and the affidavit:

"No. No, didn't no one threaten me when I first got there because I was under the impression that I was not under arrest, that I was just there to be questioned and I was going to be released."

Witnesses for the State specifically testified that defendant was not initially handcuffed or arrested. Defendant, who testified after hearing the State's witnesses, never disputed the testimony of the State's witnesses. The trial court denied defendant's motion to quash and suppress. The trial court found that defendant was not initially under arrest, but only after the accumulation of evidence which established probable cause.

Upon reviewing the record, we find that defendant has failed to overcome the presumption that his defense attorney's decision not to call the witnesses in question to testify at the hearing on the motion to suppress was a tactical one. The record suggests that defense counsel was aware of the existence of the witnesses in question because defendant's amended answer to discovery listed Myrna Hardy, Debra Miller, Charles Watson and Anthony Wright as potential witnesses. This fact, in conjunction with the aforementioned contents of the motion and testimony at the hearing, leads us to

believe that defense counsel's failure to call the witnesses in question to testify at the hearing was a strategic decision. An attorney's decision regarding trial tactics or strategy is purely a matter of professional judgment, to which review of a counsel's competency does not extend. The decision of whether or not to file a motion to quash arrest or suppress evidence is a matter of trial strategy. (*People v. Johnson* (1986), 143 Ill. App. 3d 34, 43, 492 N.E.2d 574, 580.) The same can be said of a counsel's decisions regarding the manner in which he orchestrates events during the hearing in support of such a motion.

Next, defendant contends that the trial court erred in denying his motion to reopen the hearing on his motion to quash arrest and suppress evidence because there was evidence that the defendant was arrested when the police transported him from his mother's home to the police station. Defendant maintained that evidence had a bearing on the legality of the arrest.

In order for proceedings on a pretrial motion to quash and suppress to be reopened, a defendant must first show that there is additional evidence or that there are special circumstances warranting such an action. (*People v. Holland* (1974), 56 Ill. 2d 318, 321-22, 307 N.E.2d 380, 389.) A motion may not be reconsidered merely because the defense has formulated a new argument. *People v. Attaway* (1976), 41 Ill. App. 3d 837, 850, 354 N.E.2d 448, 459.

As we noted above, defendant's own affidavit directly negates his recent claim that he was under arrest and defendant's testimony at the hearing was consistent with his affidavit. We also noted that witnesses for the State testified that defendant was not initially handcuffed or placed under arrest and that defendant, who testified after hearing the testimony of the State's witnesses, never disputed the accuracy of the State's witnesses' testimony.

After the hearing on the motions, the trial court made the following finding:

> "The motion to suppress the statements, the confession and the statements will be denied. I think this evidence has established clearly and convincingly [that] they were voluntarily given without coercion or duress. The motion to quash arrest will likewise be denied. *[B]oth parties agree the defendant was not under arrest when he left 51st and South May, he went to the police station. Some time later after the accumulation of evidence to show probable cause, he was placed under arrest,* so both motions will be denied." (Emphasis added.)

The record does not support a conclusion that defense counsel came into possession of new evidence which he could not have presented at

the original hearing on the motion. The record shows that defendant conceded that his initial interaction with the police was lawful.

When defendant filed the motion to reconsider, he again did not attack the legality of his initial contact with the police, but he asked the court to reconsider its denial based upon the same arguments first raised. Defendant's allegation that essential evidence was not presented at the hearing on the motion represents a second attempt to obtain an order to quash and suppress based upon an argument which defendant had every opportunity to present at the original hearing. Defendant's failure to show that the evidence was truly new and unavailable at the original hearing correctly resulted in the denial by the trial court of his motion for a rehearing. See *People v. O'Neal* (1988), 176 Ill. App. 3d 823, 829, 531 N.E.2d 867, 871; *People v. Kashney* (1984), 129 Ill. App. 3d 218, 224, 472 N.E.2d 164, 168.

■ Defendant next contends that he received ineffective assistance of counsel when defense counsel failed to move for reconsideration of the trial court's ruling on defendant's motion to quash arrest and suppress evidence in light of the testimony of certain witnesses during the trial. Upon review of the evidence discussed above, we find that there is nothing in the record to support defendant's claim that the trial court would have reconsidered and overruled its prior ruling on the motion to quash arrest and suppress evidence if such a motion had been filed.

Next, defendant contends that he was denied a speedy trial under section 103—5(a) of the Speedy Trial Act. (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(a).) The State maintains that defendant has waived this issue on appeal because he failed to properly preserve said issue for review.

We will, however, review the merits of said issue pursuant to Illinois Supreme Court Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)), which provides that this court may, in the exercise of its responsibility to insure that a cause has a just result, ignore the doctrine of waiver and grant any relief that the case may require. See *People v. Shelton* (1993), 252 Ill. App. 3d 193, 200.

Section 103—5(a) of the Speedy Trial Act (Act) provides as follows: "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant." (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(a).) The Act, however, is to be construed liberally and each case must be decided on its own facts. *People v. Reimolds* (1982), 92 Ill. 2d 101, 106, 440 N.E.2d 872, 874.

Defendant's argument that the State violated the Act is flawed.

Defendant was taken into custody and charged on June 12, 1984. Twenty-one days elapsed between June 12, 1984, and July 3, 1984, the date of the first continuance by agreement.

■ Defendant cannot count the time period between July 3, 1984, and December 2, 1985, towards his incarceration for purposes of the Act, with the exception of one day, because there were 16 consecutive continuances by agreement between those dates, with the exception of a one-day continuance on a motion by the State. Where parties expressly agree to a continuance on the record, it constitutes an affirmative act of delay attributable to the defendant within the meaning of section 103—5 of the Code of Criminal Procedure (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(a)), and thus suspends the 120-day term. (*People v. Turner* (1989), 128 Ill. 2d 540, 553, 539 N.E.2d 1196, 1201.) Five hundred sixteen days elapsed between July 3, 1984, and December 2, 1985. These days may not be counted for purposes of the 120-day rule because the parties agreed to continuances on the record during this period of time.

On December 3, 1985, the State filed a petition for a writ of *mandamus* challenging the trial court's authority to accept defendant's jury waiver for purposes of sentencing. One day elapsed between December 2, 1985, the last date of continuance, and December 3, 1985, the date that the State filed its petition for a writ of *mandamus*. On January 29, 1986, the supreme court stayed trial proceedings pending disposition of the petition for the writ of *mandamus*. (See *People ex rel. Daley v. Carey* (1986), 487 N.E.2d 623.) This court has previously ruled that "[t]he time during which an appeal by the State is pending is not counted for purposes of determining whether an accused is entitled to discharge under section 103—5 [of the Code of Criminal Procedure]." (*People v. O'Malley* (1982), 108 Ill. App. 3d 823, 827, 439 N.E.2d 998, 1000; see also 134 Ill. 2d R. 604(a)(4).) Fifty-seven days elapsed between December 3, 1985, and January 29, 1986.

In the present case, the trial court proceedings were properly stayed. In order for defendant to prevail, the Act would have to be construed as extinguishing the right of *mandamus*. The right of *mandamus* is constitutional in nature and must be allowed when claimed. (*George v. George* (1911), 250 Ill. 251, 253, 95 N.E. 167, 168.) Article VI, section 4, of the Illinois Constitution provides: "The Supreme Court may exercise original jurisdiction in cases relating to *** *mandamus* *** as may be necessary to the complete determination of any case on review." (Ill. Const. 1970, art. VI, § 4.) The time limit set for the hearing of such motions is "within the time fixed by the court on motion of any party or on its own motion." 134 Ill. 2d R. 381(e).

On July 18, 1986, the supreme court issued a mandate denying the State's *mandamus* petition. One hundred seventy-one days had elapsed between January 29, 1986, and July 18, 1986. The 171 days are not attributable to the number of defendant's days in custody for purposes of the Act (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(a)) because the trial court proceedings were stayed during this period.

Between July 18, 1986, and July 31, 1986, the date the jury was sworn, another 13 days passed. Only 92 days in custody were attributable to defendant for purposes of the Act (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(a)). Accordingly, we find that defendant received a speedy trial.

Next, defendant contends that he received ineffective assistance of counsel when defense counsel failed to file a motion for a discharge under the Act. (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(a).) Defendant argues that the trial court would have been required to grant a motion to discharge the case had such a motion been filed by defense counsel. We disagree.

Defense counsel may not be deemed ineffective for failing to seek a discharge under the Act where the record demonstrated that there was no lawful ground for the motion. *People v. Jarnagan* (1985), 154 Ill. App. 3d 187, 193, 506 N.E.2d 715, 720; see also *People v. Hubbard* (1986), 148 Ill. App. 3d 457, 460-61, 499 N.E.2d 604, 607 (the court rejected defendant's claim of ineffective assistance of counsel, noting that counsel is not incompetent if he refrains from raising issues which in his judgment are without merit unless his appraisal of the merits is patently wrong).

In the present case, defense counsel rendered effective assistance of counsel by declining to move for a discharge where he believed, as did the State and the trial court, that the term had tolled as a result of an Illinois Supreme Court order which explicitly stayed the trial court proceedings.

Defendant next alleges that he was denied his right to be present at a critical stage of the proceedings when he was not present during a discussion between his defense attorney and the prosecutor on the question of whether his attorney had a conflict of interest.

■ While an accused in a criminal case has an absolute right to be present at trial, there is no requirement that a defendant be present at a proceeding which does not involve his substantial rights. (*People v. Pierce* (1974), 56 Ill. 2d 361, 365, 263 N.E.2d 473, 479; see also *People v. Martine* (1985), 106 Ill. 2d 429, 437-39, 478 N.E.2d 262, 265-66 (defendant's substantial rights were not affected by his absence from the courtroom during an offer of proof); *People v. Saltz* (1979),

75 Ill. App. 3d 477, 479-80, 393 N.E.2d 1292, 1294-95 (the defendant's presence was not essential during his attorney's argument on a motion for a mistrial or his examination of jurors on the question of whether or not they had read a particular newspaper article).) Upon applying the above case law, we find that defendant's presence during the aforementioned conversation was not essential, as said conversation did not constitute a critical stage.

In addition, we are not persuaded by defendant's reliance upon *People v. Grigsby* (1977), 47 Ill. App. 3d 812, 365 N.E.2d 481. In *Grigsby*, this court held that a conflict of interest existed and that a hearing, which was held outside of the presence of defendant, for the purpose of determining whether or not a conflict existed was a "critical stage" in the proceedings against defendant. (*Grigsby*, 47 Ill. App. 3d at 816-17, 365 N.E.2d at 483-84.) The present case, however, is distinguishable from *Grigsby* because no conflict existed here. *Grigsby* is also distinguishable from the present case because the incident which defendant argues constitutes a critical stage was a conversation, not a hearing. Accordingly, we conclude that the conversation objected to by defendant did not constitute a critical stage in the proceedings affecting his substantial rights.

The next issue before this court is whether defendant waived his right to testify. Defendant alleges that he did not validly waive his right to testify, because said waiver was based upon his belief that the jury would be given IPI Criminal 2d No. 2.04, which provides that a defendant's failure to testify in his own behalf is not to be held against him.

The State maintains that defendant has waived this issue on appeal because he failed to properly preserve said issue for review. We will, however, review the merits of said issue pursuant to Illinois Supreme Court Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)), which provides that this court may, in the exercise of its responsibility to insure that a cause has a just result, ignore the doctrine of waiver and grant any relief that the case may require. See *People v. Shelton* (1993), 252 Ill. App. 3d 193, 200.

A defendant has a right to testify in his own behalf (*Harris v. New York* (1971), 401 U.S. 222, 225, 28 L. Ed. 2d 1, 4, 91 S. Ct. 643, 645; *People v. Shelton* (1993), 252 Ill. App. 3d 193, 201); however, this right may be waived (*People v. Shelton* (1993), 252 Ill. App. 3d 193, 201). A defendant is not required to execute a specific type of waiver when he declines to testify, nor is the trial court required to ascertain whether or not a defendant's silence is the result of a knowing and

voluntary decision not to testify. *Ortega v. O'Leary* (7th Cir. 1988), 843 F.2d 258, 261; *People v. Shelton* (1993), 252 Ill. App. 3d 193, 201-03; see also *United States v. Martinez* (9th Cir. 1989), 883 F.2d 750, 761; *United States v. Bernloehr* (8th Cir. 1987), 833 F.2d 749, 752.

■ Defendant in the present case effectively waived his right to testify by failing to testify or to voice his desire to testify. There is no requirement that IPI Criminal 2d No. 2.04 be given to the jury when a defendant chooses not to testify. Defendant's argument fails.

We also note that the record shows that the jury was aware of the prohibition against construing a defendant's silence against him. During *voir dire*, each juror was asked: "Do you understand that the defendant is presumed innocent and does not have to offer any evidence in his own behalf, but must be proved guilty beyond a reasonable doubt?" Each juror responded in the affirmative. Each juror was also asked: "[I]f the defendant decides not to testify in his own behalf, would you hold that against him?" Each juror replied in the negative. Accordingly, we find that defendant effectively waived his right to testify.

■ The next three issues concern allegations of ineffective assistance of counsel. Defendant complains that he received ineffective assistance of counsel when defense counsel stated that he was not sure what the evidence would prove and that he did not know what his witnesses would say. Defendant maintains that these statements prove that defense counsel was unprepared for trial. We disagree. Although the comments in question may have been improper, the record in this case does not support a conclusion that defense counsel was unprepared for trial, and defendant has failed to meet his burden of proving that defense counsel's conduct amounted to ineffective assistance.

In addition, defendant alleges that he received ineffective assistance when defense counsel elicited hearsay testimony from his mother-in-law and that defense counsel made improper remarks at trial when he argued that defendant's mother-in-law unfairly accused defendant of committing the crime in question.

The record shows that defense counsel did elicit hearsay testimony at trial and that he did argue that defendant's mother-in-law "framed" him. The remarks regarding defendant's mother-in-law, however, were admissible as the declarant, Angela Burchette, was available to testify. Where a declarant is available to testify and there is an opportunity to ascertain the veracity of her out-of-court statements by cross-examination, there is no hearsay problem. *People v. Jennings* (1986), 142 Ill. App. 3d 1014, 1027, 492 N.E.2d 600, 608.

Defendant has failed to overcome the strong presumption that defense counsel's action constituted trial strategy. Although

the testimony from defendant's mother was improper, defendant was neither prejudiced by the remarks, nor was there a reasonable probability that but for said remarks, the fact finder would have had a reasonable doubt concerning defendant's guilt. Accordingly, we cannot conclude that defendant received ineffective assistance of counsel during the incident in question.

Defendant next contends that he received ineffective assistance of counsel when defense counsel failed to object to hearsay testimony elicited from defendant's father regarding an inculpatory statement made by defendant to his mother.

The record shows that defendant's father was available for cross-examination. As we stated above, where a declarant is available to testify and there is an opportunity to ascertain the veracity of her out-of-court statements by cross-examination, there is no hearsay problem. *People v. Jennings* (1986), 142 Ill. App. 3d 1014, 1027, 492 N.E.2d 600, 608.

Again, defendant has failed to overcome the strong presumption that defense counsel's action was trial strategy. Although defense counsel's conduct may have been imperfect, defendant was neither prejudiced by defense counsel's inaction, nor was there a reasonable probability that but for said inaction, the fact finder would have had a reasonable doubt concerning defendant's guilt.

█ Next, defendant contends that the State's initiation of a motion for a directed finding in the presence of the jury improperly influenced the jury and prejudiced him. Defendant fails to cite any legal authority in support of this argument. Furthermore, the fact that the motion was initiated in the presence of the jury does not raise an inference that the jurors knew what the nature of the motion was, how it was resolved, or that they drew any conclusions therefrom. In addition, there is no evidence that defendant was prejudiced by the conduct in question.

█ Next, defendant contends that he received ineffective assistance of counsel because defense counsel failed to ask the jury to find him not guilty during closing argument. Defense counsel is not required to ask the jury to find a defendant not guilty during closing argument. (*People v. Tackett* (1988), 169 Ill. App. 3d 397, 403-04, 523 N.E.2d 647, 651-52.) As we stated above, a review of a lawyer's competency will not extend to the exercise of his trial tactics. *People v. Sowinski* (1984), 148 Ill. App. 3d 231, 246, 498 N.E.2d 650, 659.

The next two issues before this court concern ineffective assistance of counsel. Defendant contends that defense counsel's failure to tender IPI Criminal 2d No. 2.04 amounted to ineffective assistance of counsel. This allegation is also flawed. Defendant argues that there

was a "possibility" that the jury considered his failure to testify during its deliberations.

A defendant's claim that the jury "might" not have convicted him beyond a reasonable doubt had an instruction been given is insufficient to render such an omission ineffective assistance of counsel sufficient to merit the reversal of his conviction. (*People v. West* (1986), 142 Ill. App. 3d 876, 878-79, 492 N.E.2d 566, 568.) A defendant must show prejudice resulting from the failure to tender preferred jury instructions in order to demonstrate a denial of effective assistance of counsel. (*People v. Jones* (1986), 148 Ill. App. 3d 345, 354-55, 499 N.E.2d 510, 516.) We hold that defendant has failed to show that he was so prejudiced.

In addition, *Carter v. Kentucky* (1981), 450 U.S. 288, 305, 67 L. Ed. 2d 241, 254, 101 S. Ct. 1112, 1121-22, cited by defendant in support of his contention, is distinguishable from the present case. In *Carter*, the Supreme Court held that a State trial judge has the obligation, upon proper request, to issue an instruction requiring the jury not to draw any negative inferences from a defendant's failure to testify. *Carter*, however, does not address the question of whether an attorney's failure to request such an instruction amounts to ineffective assistance of counsel.

Accordingly, we conclude that defendant was not denied effective assistance of counsel when defense counsel failed to tender IPI Criminal 2d No. 2.04 to the court and the jury. Defendant is not entitled to a new trial based upon any of his ineffective assistance of counsel claims.

Finally, defendant contends that the trial court erred in failing to appoint new counsel to represent him on his post-trial allegations of ineffective assistance of counsel.

■ There is no *per se* rule requiring the appointment of new counsel to represent a defendant whenever he alleges ineffective assistance of counsel in a post-trial motion. (*People v. Brandon* (1987), 157 Ill. App. 3d 835, 846, 510 N.E.2d 1005, 1012.) In the present case, the court, after reading defendant's motion and listening to his argument, found that there was "nothing in what [defense counsel] did or failed to do that would change the outcome of the trial." A defendant must show substantial prejudice or demonstrate how the outcome of his trial would have differed based on the alleged ineffective performance. (*Brandon*, 157 Ill. App. 3d at 845, 510 N.E.2d at 1011.) Defendant neither made such a showing at the trial level, nor has he made such a showing here. Accordingly, defendant is not entitled to a new hearing on post-trial motions where his original claim of ineffective assistance was insufficient to warrant the

appointment of new counsel. See *People v. Davis* (1991), 208 Ill. App. 3d 33, 43, 566 N.E.2d 932, 938 (if a claim of ineffective assistance of counsel raised in a post-trial motion lacks merit, no new counsel need be appointed to represent a defendant on such claims).

For the aforementioned reasons, we affirm the judgment of the trial court.

Affirmed.

CERDA and GREIMAN, JJ., concur.