**UNITED STATES of America, ex rel. Andrew KOKORALEIS, Petitioner,**

v.

**The DIRECTOR OF the ILLINOIS DEPARTMENT OF CORRECTIONS, and Jim Ryan, Illinois Attorney General, Respondent.**

**No. 95 C 3913.**

United States District Court, N.D. Illinois, Eastern Division.

May 2, 1997.

■■■■■■■■■■■■■■■■■■■■

Alan Michael Freedman, Freedman & Bornstein, Chicago, IL, for plaintiff.

Arleen C. Anderson, Atty. General's Office, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

Andrew Kokoraleis is under sentence of death for murder and another sentence of 30 years for aggravated kidnaping, both received in the Circuit Court of DuPage County. Before he came to trial in DuPage County, he had received a sentence of life without parole in Cook County, this sentence for a different murder. Essentially prosecutors have portrayed Kokoraleis as one of three serial killers who perpetrated horrifying crimes against women. The petitioner has always maintained that he is not guilty of any such crimes and that his confessions to them were false. By their verdict the jury implicitly accepted the serial killer characterization.

On May 15, 1982, a 21–year–old secretary in a real estate office, Lori Borowski, disappeared between the time she left for work, about 8:15 a.m., and the time she was supposed to arrive. Her employer found her shoes and keys on the pavement in front of her office. He also found cosmetics, coins and a nutdriver, a hand tool. An owner of a nearby store reported that he saw nothing on the pavement when he was there at 7:50 a.m., but he did see a reddish-orange van parked in the normally empty lot. He said the van was similar to one which police later found being driven by Edward Spreitzer and belonging to Robin Gecht.

On October 10, 1982, Lori Borowski's remains were discovered in an unused portion of a cemetery. The clothing was the same that she was wearing on May 15. Her blouse was up around her armpits and her bra had been lowered. Her purse was found a few yards away and jewelry was found about her

remains. Some of her flesh was intact but her left nipple was missing. An anthropologist attributed the absence of the nipple to decomposition, insects, animals, or amputation. He found bone injuries in the front of the upper chest, these consistent with stab wounds from a sharp instrument like an ice pick. He found frontal wounds on two lower vertebrae, cause unknown, and three more wounds to the back, causable by knife or ice pick. Her nasal bone had been fractured.

Ten days later the police stopped a reddish-orange van described by a crime victim. In it was Edward Spreitzer along with three knives. The interior handle on the back door was missing; it could be opened only by using a tool like a nutdriver.

After several more days, the police arrested Robin Gecht, the car owner, and then Spreitzer whose statements in turn led the officers to Kokoraleis who, over a two-day period, confessed to the murder of Lori Borowski and several more women.

When shown three photographs of Lori Borowski, the petitioner said, "This is the girl that Eddie Spreitzer and I killed in the cemetery." He told DuPage police that he and Spreitzer were driving in Gecht's van one morning, entered a lot, saw her, forced her into a van, drove to the cemetery, and beat and stabbed her. When she was dead they dragged her body into some weeds. He wrote out a confession in his own hand.

In all, Kokoraleis talked to police from DuPage County and from the City of Chicago, and to Assistant State's Attorney (now Judge) Robert Bastone and spoke of the murders of other women.

About Linda Sutton, age 26, Kokoraleis said that he and Gecht were driving in the Rush Street area of Chicago when Gecht talked with a woman who then encountered the van. They drove to a motel in Villa Park where they found Spreitzer. The woman refused to leave the van. At Gecht's request, he and Spreitzer pulled her from the van, Gecht struck her several times and, with Spreitzer's help, dragged her to a field behind the motel. Kokoraleis watched Gecht pull down the woman's slacks and Spreitzer hold her arms while Gecht raped her. Gecht

then took his hatchet and hit her three or four times in the face. Over the course of three statements, he added that Gecht had struck the victim, stabbed her and amputated a breast with some piano wire. The autopsy generally confirmed the manner of death as Kokoraleis described it including the breast amputation. He recalled the murder as occurring in spring or early summer of 1981; the body was found on June 1, 1981 in a field near the motel. Her hands were cuffed behind her back; her slacks and underpants had been pulled down and her sweater and bra had been pulled up.

About Shui Mak, aged 30, Kokoraleis said that he and Spreitzer saw an oriental woman walking alone. They offered her a ride, she accepted. But when they stopped in a field where new houses were being built and Spreitzer told her to get out she refused, so he and Spreitzer pulled her out. Spreitzer hit her several times, she fell and they dragged her a short distance. Spreitzer stabbed her three or four times with a kitchen knife. Kokoraleis became ill and went back to the van. This occurred in late May or early June 1982. Other evidence showed that Mak disappeared on May 30. Her remains were found on September 30 in a wooded area near a new housing development. She was clothed but her sweater and her slacks zipper were both torn. There were multiple fractures, some attributed to blunt trauma and others from unknown causes; stabbing was a possible cause of rib injuries.

The defense was that the confessions were coerced. Kokoraleis said he worked for Robin Gecht from mid–1981 until May 1982. He had met Spreitzer before that period. He took part in no murders and the confessions were coerced from him. He testified that he also told police that he was involved in the murder of Lorraine Bieze. A police officer was then called to testify that he believed petitioner did not commit the Bieze murder. A store manager at the plaza where Lori Borowski was abducted said that on the morning of her disappearance he saw a woman and a man fighting near a silver or gray car parked close to the office where Borowski worked. Another person at the shopping

plaza that morning noticed a silver or off-white car leaving the lot on that same morning, and he identified Spreitzer as the angry driver of the car. A third witness said that she saw a woman whom she identified, from a picture, as Lori Borowski, alive and well two weeks after her disappearance. Kokoraleis' brother and sister testified that they went with their brother to visit their mother's grave on May 24, the day after Linda Sutton's disappearance. His sister said she had seen him on May 23 at 4 or 6 in the afternoon and then again at 9 or 9:30 the next morning. She noticed nothing unusual about him that day.

During the cross-examination of Kokoraleis, he admitted that he told the police of his participation in 16 different murders and that he did so prior to the time he claimed he was beaten by police officers. On direct examination, he had testified that police struck him to force him to make an untrue confession to the murder of Rose Beck Davis. On cross examination, he was asked about the presence of an assistant state's attorney when he made that confession and whether the assistant had told him what to say. In the course of this inquiry on cross-examination, the contents of that confession were disclosed, i.e., that he, Gecht and Spreitzer abducted the woman from a Chicago street, took her to a nearby gangway, beat, raped and stabbed her and violated her with an ax handle.

The jury returned a guilty verdict on the charge of murdering Lori Borowski.

At the sentencing hearing the prosecution proved the defendant's age and the fact of his conviction of the Davis murder and of the convictions for murder and kidnaping just rendered by the jury, all to establish death penalty eligibility. At the next stage, the prosecution proved more of the details of Rose Beck Davis' murder. She was found in a gangway. A ligature was fixed tightly on her neck and one of her arms, her sweater raised and her bra ripped off, slash wounds were on her breasts, her slacks and underpants were around her ankles, her face was blood covered and there was more blood in the vaginal area. The pathologist found blunt trauma injury to her face and her nose was badly broken. There were contusions in

several places on her body and a four inch long piece of wood was found in her vagina, it had perforated the vagina and entered the abdominal cavity. Kokoraleis' confession to the crime was proved as well. He said that he and Spreitzer seized the woman who was walking on the street, forced her into the van where he put handcuffs on her while Spreitzer gagged her. At the gangway, Gecht hit her in the face while he pulled her slacks down. Gecht raped her and later struck her in the face with a hatchet and forced the handle of the hatchet into her vagina. Acting at Gecht's direction, Kokoraleis took a knife and "poked at her midsection three or four times." He dropped the knife and fell against a wall of a building. Eventually they went back to the van and drove off.

The mitigation witnesses were a chaplain at the Cook County jail who knew Kokoraleis during the two years petitioner was in that jail. He found petitioner to be helpful and unthreatening and rehabilitable. A religious counselor at the DuPage County jail knew petitioner for a year and found him unthreatening and believed he was not a danger to society. The mother of someone who Kokoraleis dated said that her daughter had run away from home and petitioner had persuaded her to return home. She visited Kokoraleis at both jails. He had corresponded with her daughter while he was in jail. Kokoraleis testified that he had become involved in religion while he was in jail, he denied his guilt and said he was framed.

The jury found no mitigating circumstances sufficient to preclude a sentence of death, and the trial judge imposed a death sentence.

On direct appeal, petitioner challenged the admission of the other murders but the Illinois Supreme Court found them admissible both as modus operandi evidence and as supporting the reliability of the confession and its voluntariness; the Court also rejected various challenges to admission of the details of some of those murders. He also appealed the unobjected to evidence that Spreitzer, who did not testify, had implicated him. The Court found this point waived and found counsel was competent despite failing to object because the evidence was consistent with the defense theory that the police put words (perhaps Spreitzer's words) in his client's mouth. Indeed, defense counsel had brought this fact out as well so the confrontation claim was waived. The claim of improper cross examination questions to Kokoraleis, e.g., is officer x lying when he says something different from what you say?, left the Court unpersuaded. While the questions were generally impermissible, they were not necessarily inappropriate when Kokoraleis was indeed claiming that he was framed by lying police officers. In any event, defense counsel (now Judge) Eugene Wojcik had not objected, and this waiver was not incompetent where credibility was the issue. So too for arguments of the prosecutor who told the jury the issue was who was lying. The petitioner argued that the jury was improperly left with the impression that he had been convicted of four murders in Cook County, instead of four counts of murder involving only a single victim. In light of the undisputed statements of counsel and the record, the Court concluded the jury could have only thought that it was the murder of Rose Beck Davis of which Kokoraleis had been convicted. There was a challenge to an erroneous instruction on felony murder given without objection. The jury returned a disjunctive verdict finding beyond a reasonable doubt that either the statutory aggravating factor of multiple murder or the factor of felony murder existed. The instruction told the jury that if felony murder is to be applicable, the defendant himself must have inflicted the fatal injury *or inflicted injuries contemporaneously with those causing death.* (Emphasis added.) As it turned out, the underlined portion was not the applicable law at the time this murder occurred. To fail to object to such an instruction was incompetence of counsel, argued Kokoraleis. The Court found that no possible prejudice could have resulted from this act because the other aggravating circumstance, multiple murder, was undeniably true. It also thought there was evidence beyond a reasonable doubt that Kokoraleis inflicted fatal injury because Kokoraleis said he killed the woman and said that he, as well as Spreitzer, beat and stabbed her. The Court rejected the double enhancement claim under state law because

it found that there were separate acts of physical harm (apart from fatal ones) which could establish that a kidnaping was aggravated. The Court did not find that Kokoraleis had the right to unsworn allocution to the jury or that the prosecutor gave an improper closing argument or that he was entitled to an instruction that told the jury the alternative to the death sentence was life in prison without parole or that the court should have told the jury the admission of many other murders was without corroboration. Finally the Court rejected, as it had in other cases, a constitutional challenge to the Illinois death penalty law. *People v. Kokoraleis*, 132 Ill.2d 235, 138 Ill.Dec. 233, 547 N.E.2d 202 (1989).

After denial of his post-conviction petition, Kokoraleis appealed again. The Court rejected his challenges to the competency of counsel on grounds of procedural default insofar as the incompetency claim might have been raised on appeal as might a claim of poor closing argument been raised. It rejected on the merits the claim of incompetency based on the failure to mount a psychiatrically based defense in mitigation. It found counsel's judgment and investigation to be within reasonable bounds. It refused to reconsider two grounds it had already rejected on appeal. It rejected other challenges to instructions of the sort decided against petitioners in *Gacy v. Welborn*, 994 F.2d 305 (7th Cir.1993) and *Free v. Peters*, 12 F.3d 700 (7th Cir.1993). Finally, it rejected a claim that this death sentence was barred by double jeopardy and collateral estoppel because of the failure to secure the death sentence in the earlier Rose Beck Davis murder trial. Here the Court said it was a matter that could have been raised on direct appeal and was not.

The petition for habeas corpus narrows somewhat the range of claims that were made in state court.

1. Telling the Jury that the Alternative to the Death Penalty is Life in Prison Without Parole.

In *People v. Gacho*, 122 Ill.2d 221, 119 Ill.Dec. 287, 522 N.E.2d 1146 (1988), the Court reiterated its longstanding rule that a prosecutor could not argue for the death penalty on the grounds that the murderer might be paroled. Then it found, for the first time, the standard instruction telling the jury that the alternative to death is imprisonment was inadequate. It then decided to abandon its prior holdings regarding the standard instruction and said:

> Under the supervisory authority inherent in this court, as well as that conferred by … the Illinois Constitution … we direct that after the date of this opinion the trial courts of this State, when conducting a sentencing hearing involving a defendant convicted of multiple murders use [an instruction which states that where no death penalty is imposed, life imprisonment will be imposed and no one serving that sentence can be paroled or released except through executive clemency].

 This rule was applied to anyone whose case was tried after the date of the opinion and to no one whose case was tried before it except Robert Gacho. At least eight multiple murderers whose cases were on direct appeal, including Kokoraleis, were not entitled to invoke this rule. In *Stewart v. Lane*, 60 F.3d 296 (7th Cir.1995), this was held not to be error. There is no reason why it should be. A State is perfectly free to apply its own judge made law in a fully prospective fashion. A prospective only construction of an existing statute may be constitutionally problematic (*Fetterly v. Paskett*, 997 F.2d 1295, 1298–1301 (9th Cir.1993)) but this should not be true of the rules made by judges, at least those designed to be prophylactic in nature. It is clear that the rule in *Gacho* was prophylactic. The Court did not hold that death penalty judgments imposed without the instruction were inherently flawed even when parole was argued to the jury, it simply set forth a rule which would save it and trial judges from having to make nice calculations in particular cases about how prejudicial an argument had been.

 *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), did not go as far as *Gacho* did. It did not require an instruction in all cases, but it said that instructions about life without parole should be given when the prosecutor argues that parole is possible. *Simmons* is a new

rule and not applicable to this case on habeas corpus. I am persuaded here by *O'Dell v. Netherland,* 95 F.3d 1214 (4th Cir.1996).

██ Yet if *Simmons* were to apply here it would not affect the result. It was not parole that was the subject of the prosecutor's argument; it was the opinion of a mitigation witness, a former college science professor and then religious counselor who stated, on cross examination, that Kokoraleis would not be a danger to society if he were free. The defense counsel had urged the jury to consider the rehabilitative potential of his client. His argument was that Kokoraleis had no prior criminal history, had been confined in jail since he was nineteen and had made the best of his situation becoming sincerely religious, helping people and impressing two religious counselors, one of whom had a doctorate in science. The prosecutor was entitled to use what the witness had said in an attempt to discredit the witness. The defense did not object. The prosecution also said Kokoraleis had no rehabilitative potential. It was never argued that Kokoraleis could or would be paroled, and the one thing that was clear to everyone in the courtroom was that Kokoraleis was either going to be executed or imprisoned. And by asking one of the counselors if it was okay just to let Kokoraleis "go right now," it was understood as an attack on the religious counselor witnesses, both of whom felt unthreatened by petitioner and endorsed his character. The prosecutor was entitled to argue that the religious counselors' opinions were too extreme to be given any credit. This is not the argument that troubled the Court in *Simmons*. Read as a whole the argument was not about future dangerousness or parole, it was about the defendant's character and the worth of the mitigation witness' opinions of that character.

Finally, there is the related claim that the jury ought to have been told not only about the conviction in the Rose Beck Davis murder but also that the sentence there was life imprisonment without parole, because it would incline a juror less toward the death penalty since there was an assurance of life in prison. The argument is made without citation to authority and was not made on direct appeal. On post-conviction the Illinois Supreme Court found it to be procedurally defaulted. *People v. Kokoraleis,* 159 Ill.2d 325, 334, 202 Ill.Dec. 279, 284, 637 N.E.2d 1015, 1020 (1994). It is defaulted here.

## 2. The Life Sentence in the Davis Murder Case as Estoppel of the Death Penalty

In the Cook County prosecution of Kokoraleis, the prosecution put in much of the same evidence that was used in the trial in this case. But there were apparent differences between the Borowski and the Davis murder prosecutions. In the murder of Rose Beck Davis, Robin Gecht inflicted most of the injuries on the victim including the revolting mistreatment of her body. Robin Gecht was not shown to be present at the murder of Lori Borowski. Kokoraleis said he and Spreitzer both killed her. Moreover, in DuPage the prosecution had the fact of the conviction of the Davis murder.

There is really no precedent for the argument petitioner tries to make now. *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) involved a second sentence hearing for the same murder. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), involved a trial of a second victim of a single incident of robbery at a poker game, after the defendant was acquitted in the trial involving the first victim. The closest decided case is *Ciucci v. Illinois,* 356 U.S. 571, 78 S.Ct. 839, 2 L.Ed.2d 983 (1958), which involved a man who murdered his wife and four children in the same incident and was tried seriatim for each of the murders. The evidence of all murders was introduced in each trial. In the third trial, Ciucci received the death penalty and the fourth case was never tried. The Supreme Court held that Illinois was constitutionally entitled to prosecute these cases singly. Today Illinois law would preclude such proceedings (Sec. 3–3 of the Criminal Code of 1961) and *Ashe* would preclude a second trial if the first had resulted in acquittal. But *Ashe* has not been applied to sentence hearings, and Kokoraleis' case is very different from Ciucci's and Ashe's. Kokoraleis' murders each occurred separately, a different time and a different place as well as a

different victim. Charges of murder allegedly occurring in different counties were probably not capable of joinder. An argument could be made (but is not) that the prosecution should be precluded from introducing evidence of other murders unless it represents that defendant will not be prosecuted for those other murders. This was not a ground for any objection at trial and the argument, which seems weak, would be waived if it had been made here. The double jeopardy/collateral estoppel claim is without constitutional merit.

■■■ All arguments on this point, moreover, are procedurally defaulted. The Illinois Supreme Court said of these claims that they "could have been, but were not, raised on direct appeal and ... finding no recognized exception applicable, we decline to consider their merits." *People v. Kokoraleis*, 159 Ill.2d at 334, 202 Ill.Dec. at 284, 637 N.E.2d at 1020. Petitioner criticizes the ruling as inconsistent with the Illinois Supreme Court's basic doctrine that such claims could only be made by going outside the record. Kokoraleis argues he could only argue this on appeal by adding the facts of the earlier trial to this record. This criticism seems baseless. The Supreme Court was quite capable of considering the Davis trial without adding to the record before it. There was a reported opinion in that case. Indeed, the affirmance of that conviction over challenges to evidence of the other murders was specifically cited in the court's opinion. *See People v. Kokoraleis*, 132 Ill.2d 235, 257, 138 Ill.Dec. 233, 244, 547 N.E.2d 202, 213 (1989) (citing *People v. Kokoraleis*, 154 Ill.App.3d 519, 107 Ill.Dec. 482, 507 N.E.2d 146 (1st Dist.1987)). This procedural default, like the one with respect to informing the jury of the life sentence in the *Davis* case, precludes review on habeas corpus. *See Willis v. Aiken*, 8 F.3d 556, 560–561 (7th Cir.1993); *Henderson v. Thieret*, 859 F.2d 492, 496 (7th Cir.1988).

A variation of this argument, which the Illinois court found to be waived, is that the jury should have been told of the life sentence in the *Davis* case, told what aggravating factors that jury found and then instructed that they would need an "independent" aggravating factor to return a death sentence. There is also a claim that this would be necessary to make sure that a jury imposed similar sentences in similar circumstances. This defaulted argument is made without precedent. There is law which would require a State to evaluate the consistency of the imposition of its death sentences but none of it says that it is the jury that decides this question. *See, e.g., People v. Towns*, 174 Ill.2d 453, 479, 221 Ill.Dec. 419, 431, 675 N.E.2d 614, 626 (1996) (noting that the federal Constitution does not require a proportionality review but that it, the Illinois Supreme Court, may in its discretion conduct this review); *State v. Moody*, 481 S.E.2d 629, 639 (N.C.1997) (characterizing proportionality review as an exclusive duty of the North Carolina Supreme Court); *Echols v. State*, 326 Ark. 917, 988, 936 S.W.2d 509, 546 (1996), *cert. filed*, No. 96–8385 (Mar. 22, 1997) (noting that Arkansas courts had conducted proportionality review in the past although the federal constitution did not require one). This claim, as it is stated here, is meritless.

### 3. The References to Spreitzer Implicating Kokoraleis

On appeal the Illinois Supreme Court addressed this issue and said all that needs to be said on the point:

[D]efendant cite three instances.... In describing the events leading to the defendant's arrest, a police detective testified that ... he was informed by a second officer that Spreitzer 'was now implicating another party by the name of Andy Kokoraleis'; the detective also testified that at the outset of his initial interrogation of defendant, he told the defendant that he 'was being implicated in murders with Spreitzer and by Spreitzer.' The second officer [testified] the decision to arrest [was based on the fact] that Spreitzer had 'implicated' the defendant. Edward Spreitzer did not testify at trial, and the defendant contends that the officers' statements denied him his constitutional right to confront his accuser, Spreitzer.

Any error in this regard was, we believe, harmless. The same information was in-

troduced into evidence by defense counsel, who elicited similar testimony from a number of witnesses, including the defendant himself. For example, the defendant testified on direct examination that he was told by one of the arresting officers that Robin Gecht and Edward Spreitzer had said that he had committed a number of murders with them. Defense counsel asked similar questions of law enforcement officers on cross-examination.

\* \* \* \* \* \*

The State suggests that counsel's general failure to object [except in one instance]—and indeed, his presentation of the same information through his own questioning of witnesses—demonstrates that counsel viewed the information as consistent with the defense theory of the case. We agree. That the State's witnesses claimed that Spreitzer ... implicated defendant was entirely consistent with the defense theory ... that the defendant ... had been framed by the authorities. It may be noted that later, in his presentence report, the defendant specifically claimed that Spreitzer had been involved in the plan and had aided the police.

In a footnote in the defendant's brief, appellate counsel contends that ... failure to register objections to the statements constituted ineffective assistance of counsel ... however, counsel's failure to object was consistent with the ... theory ... that the defendant had been framed by the authorities and by the alleged accomplices, and that the defendant's statements ... were not truthful. Accordingly, we do not believe that the defendant was prejudiced by counsel's failure to register objections to the testimony.

*People v. Kokoraleis,* 132 Ill.2d at 262–264, 138 Ill.Dec. at 246–247, 547 N.E.2d at 215–216.

■ This decision is clearly entitled to deference under 28 U.S.C. § 2254(d). Petitioner claims that deference is not due because the opinion is not well reasoned. I think it is well reasoned, but that is not the standard as *Hennon v. Cooper,* 109 F.3d 330 (7th Cir. 1997), makes clear; the standard is "whether the determination is at least minimally con-

sistent with the facts and circumstances of the case." This standard is overmet here.

### 4. The Constitutionality of the Illinois Death Penalty Statute

The petitioner, perhaps to preserve these points for the record, raises a series of challenges to the state death penalty statute. Some of these points seem not to have been raised in state court and appear to be defaulted, i.e., that death is not determined as appropriate in each individual case, that there is inadequate notice of the request for the death penalty, that the statute is vague and allows improper findings of aggravating factors. In any event, all of these claims and the ones he did raise below have been rejected by the Court of Appeals for the Seventh Circuit. *See Silagy v. Peters,* 905 F.2d 986 (7th Cir.1990); *Williams v. Chrans,* 945 F.2d 926 (7th Cir.1991); *Gacy v. Welborn,* 994 F.2d 305 (7th Cir.1993); *Free v. Peters,* 12 F.3d 700 (7th Cir.1993); *Davis v. Greer,* 13 F.3d 1134 (7th Cir.1994).

### 5. Proving Aggravating Circumstances/The Illinois Supreme Court and Its Default Rules

Kokoraleis argues, in part as he did in state court, that the aggravating circumstances required under Illinois law were not proved beyond a reasonable doubt. The argument made to the state court was that Illinois law required proof that Kokoraleis inflicted the fatal wounds before the murder could be aggravated to a capital offense by virtue of the fact that it occurred during the commission of a felony. At the time of the murder of Lori Borowski, this clearly was the law. The Illinois Supreme Court said that this argument failed because there was evidence that Kokoraleis inflicted a fatal wound since he said he "killed" her and admitted he stabbed her. And the supreme court also noted that there was no objection to the incorrect instructions which told the jury that an aggravating circumstance would exist if the murder occurred during a felony and defendant inflicted injuries contemporaneously with those causing death. In response to an attack on the competency of counsel for failing to object, the court said,

[T]he defendant undeniably had been convicted of the murders of two or more persons, rendering him eligible for the death penalty, and he makes no challenge to that proof. Although the jury's finding of eligibility [based on two separate factors, multiple murder and felony murder] was phrased in the disjunctive, we are certain that multiple murder circumstance was established here.... Given the unchallenged evidence that defendant was eligible ... because of his commission of multiple murders, we cannot say that our confidence in the reliability of the jury's eligibility determination is undermined by the failure to provide the jury with what we have assumed to be the correct statement of the felony murder aggravating circumstance. Accordingly, we do not believe that counsel was ineffective in this regard.

*People v. Kokoraleis,* 132 Ill.2d at 276–78, 138 Ill.Dec. at 253, 547 N.E.2d at 222.

 There is an insuperable barrier to raising any complaint about proof of aggravating circumstances on habeas corpus, two barriers in fact. First, the claim in state court was never made as a constitutional claim. The brief on appeal simply argued lack of proof and the argument was phrased in garden variety non-constitutional language.[1] The state court must be fairly presented with both the factual and legal bases of the federal claim in order to preserve it for federal habeas corpus. *Williams v. Washington,* 59 F.3d 673, 677 (7th Cir.1995) ("fair presentation" of federal constitutional claims contemplates a submission of both the operative facts and the controlling legal principles to the state court). To "fairly present" a constitutional claim, petitioner should have done at least one of the following: (1) relied on federal cases employing constitutional analysis; (2) relied on state cases applying constitutional analysis to similar facts; (3) asserted claims particularly enough to call to mind a specific constitutional right; (4) alleged a pattern of facts well within the mainstream of constitutional litigation. *Verdin v. O'Leary,* 972 F.2d 1467, 1473–74 (7th Cir. 1992). Petitioner is reduced to defending his right to raise the argument here by pointing to the fact that in state court he cited a case from a careful reading of which the Illinois Supreme Court could have inferred that the claim was constitutional in nature. This one case, *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), did not clearly address a federal constitutional issue. More is required. *Verdin,* 972 F.2d at 1475 ("It is incumbent on petitioner to 'raise the red flag of constitutional breach.'")

Second, the claim here is really quite different from the one made in state court. In order to avoid the sensible observation of the state court that the multiple murder circumstance was undisputed, the petitioner now argues as he never has before that the multiple murder circumstance is subject to doubt because all the jury knew was the fact of the conviction and not whether the Davis murder was intentional.[2] The rule is simple, "federal courts cannot review on petition for writ of habeas corpus questions of federal law that have not been properly presented to the state court." *Willis v. Aiken,* 8 F.3d 556, 560 (7th Cir.1993). That which was never presented is patently included in the class of that which has not been properly presented.

 Even if the felony murder claim had been properly presented as a constitutional claim there is nothing unreasonable about the state court's decision to reject the similar, non-constitutional argument actually

---

1. There were two related claims clearly stated in constitutional language. One was that the new law could not be applied to Kokoraleis without violating *ex post facto* doctrines (which the state court apparently accepted) and the other was that counsel was constitutionally ineffective (which the state court addressed on its merits). There is no authority for the proposition that merely by saying "I challenge proof beyond reasonable doubt" one automatically raises a *Jackson v. Virginia* claim. 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

2. The jury did have more than the fact of the conviction. It had Kokoraleis' confession to participation in the crime including his statement that he poked with a knife at the victim's midsection three or four times. The jury could also infer intent from the circumstances of the crime, the details of which had been the subject of testimony by police and the medical examiner.

presented. The premise of the petitioner's argument is succinctly stated: "Petitioner noted that he and Ed Spreitzer both took turns stabbing Lorraine Borowski: nothing in his statement indicates that petitioner struck the fatal blow." It is unclear to me why, in this murder case, there was a single fatal blow. Sometimes this is true and in the state law case upon which petitioner relies, it was true. *People v. Hargis*, 118 Ill. App.3d 1064, 74 Ill.Dec. 748, 456 N.E.2d 250 (1983), *overruled on other grounds, People v. Daugherty*, 102 Ill.2d 533, 82 Ill.Dec. 315, 468 N.E.2d 969 (1984). In *Hargis*, the pathologist concluded that the victim sustained five stab wounds but that only one was the cause of death. *Id.* at 1069, 74 Ill.Dec. 748, 456 N.E.2d 250. In simple terms, here there were fatal blows and Kokoraleis admitted inflicting some of them, which means Kokoraleis was right when he said he and Spreitzer killed this woman. Even if the constitutional argument had been fairly presented to the state court on the basis of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the state court's resolution of the matter is reasonable and entitled to deference under 28 U.S.C. § 2254(d).

### 6. Ineffective Assistance of Counsel at Sentencing

The final argument for a writ of habeas corpus is most common in capital cases, an attack on trial counsel for rendering ineffective assistance of counsel, limited to the sentencing phase of the case. The argument here is powered by more than mere hindsight, this petitioner did avoid the death penalty in the Cook County trial. It is unusual to have what real estate agents call "comparables" in looking at how counsel choose to defend cases dealing with very closely related facts.[3]

### A. What Trial Counsel Did.

 The Cook County trial is important to the claim that the DuPage County trial

counsel made an ineffective presentation in mitigation. What counsel did in the DuPage trial was to suggest that there was still some doubt about the strength of the prosecution's case, and he pointed out some inconsistencies between the confessions and the facts of the murders to support this claim. This residual doubt argument, as it is sometimes characterized, is thought to rely upon the premise that the finality of death as a penalty will cause a jury to require more than proof beyond a reasonable doubt to impose capital punishment. This theory, which some courts have criticized, is not so far outside the realm of reason that counsel who constructs an argument on the basis of it is ineffective. Indeed, it is this very concern with finality that has caused the American Bar Association to adopt a standard which goes so far as to require defense counsel in capital cases to go beyond what is required even in cases where the stakes are a lifetime in prison. *See* A.B.A. Standards for Criminal Justice, Standard 4–1.2(c) (3rd ed.1994). A competent defense counsel could act on the premise that finality counts, not only with the A.B.A., but with jurors as well.

 The other part of defense counsel's approach was to call witnesses who would testify to Kokoraleis's character, the sincerity of his religious beliefs and his ability and willingness to help others. The Cook County trial featured a plea for mercy, a request by the defendant to have his life spared and an argument that life in prison was punishment enough. None of these themes were explicitly sounded in DuPage County but the evidence and argument about rehabilitation, really an argument about religious redemption, was an implied plea for mercy. The Cook County approach was effective and, arguably, a better one than counsel here employed, but the DuPage argument did not fall below the standards of competence. The Cook County case concerned a murder in which Kokoraleis played a lesser role than he did in the murder of Lori Borowski. At the time of the

---

3. There might be another comparable to be found in the trial of Edward Spreitzer who did offer the sort of mitigation that Kokoraleis suggests would have worked in his case. It did not work with the jury in Spreitzer's case but neither side relies on this result, perhaps because the significant distinctions between the two cases cut in both directions. *See People v. Spreitzer*, 123 Ill.2d 1, 121 Ill.Dec. 224, 525 N.E.2d 30 (1988).

DuPage trial, Kokoraleis was facing a more difficult challenge, not the least part of which was the fact that he had been convicted of murder once before. At the time of the DuPage trial, he also had much more time in custody, in two separate institutions and thus more evidence to offer of his religious redemption. In these circumstances his trial lawyer's actions were not constitutionally ineffective.

■ The argument about what counsel did do is, in any event, procedurally defaulted. Such arguments can ordinarily be made on appeal. Everything that petitioner says about his lawyer now could have been said as well on direct appeal. Even the closing argument in the Cook County case could have been judicially noticed on appeal to the extent it was not apparent in the reported appeal from that judgment. The Supreme Court of Illinois noted this failure to raise the issue on direct appeal, and that counsel on direct appeal was not the same as trial counsel. It then went on to apply its own default rule and refused to consider whether what defense counsel did argue amounted to ineffective assistance. *People v. Kokoraleis*, 159 Ill.2d at 327–328, 202 Ill.Dec. at 281, 637 N.E.2d at 1017. This is an adequate state ground for upholding the judgment and cannot be avoided in habeas corpus. Petitioner's argument that the Illinois Supreme Court's application of the state default rule was freakish in this case does not hold water where the court has applied the rule in similar fashion in at least five other recent death penalty cases. *See People v. Lewis*, 165 Ill.2d 305, 336, 209 Ill.Dec. 144, 158, 651 N.E.2d 72, 86 (1995); *People v. Fair*, 159 Ill.2d 51, 88, 201 Ill.Dec. 23, 43, 636 N.E.2d 455, 475 (1994); *People v. Hobley*, 159 Ill.2d 272, 309, 202 Ill.Dec. 256, 273, 637 N.E.2d 992, 1009 (1994); *People v. Johnson*, 159 Ill.2d 97, 120, 201 Ill.Dec. 53, 63, 636 N.E.2d 485, 495 (1994); *People v. Banks*, 161 Ill.2d 119, 143, 204 Ill.Dec. 107, 118, 641 N.E.2d 331, 342 (1994).

### B. What Defense Counsel Did Not Do.

The Illinois Supreme Court did consider the argument that defense counsel should have investigated a possible mental condition mitigating circumstance. Petitioner's present counsel had him examined by a psychiatrist who found him to have a borderline personality disorder and believed he was vulnerable to the influence of Robin Gecht who acted in Charles Manson-like ways to influence the will of the petitioner. The psychiatrist found that petitioner would have appreciated the criminality of his conduct but lacked sufficient self-control to stop himself. In its opinion the court said:

> Effective representation, the argument goes in light of the affidavits, required counsel to investigate defendant's psyche as the root cause of his criminal responsibility. Defendant, however, never wavered from his insistence that he did not commit any crimes for which he now stands convicted. [He] took the stand at trial ... championing his complete innocence. He insisted that inculpatory statements he had given to police ... were coerced.... [He] claimed his knowledge about the crimes came exclusively from talking to the police.... To the very end he steadfastly maintained he was 'framed'... for at his Sentencing hearing [he] reiterated his ... testimony that he was unjustly convicted. The argument is not that objective evidence, like a psychological profile, existed, which should have lead counsel to independently explore whether defendant's will was overborne by Gecht in spite of ... protestations of innocence. Such circumstances are likely to generate issues as to counsel's effectiveness.... Instead the argument is that counsel was ineffective for not having divined, on his own, an explanation for defendant's culpability in the face of defendant's assertions of innocence.... What investigation is reasonable depends on the informed strategic choices of, as well as the information supplied by, the defendant. In view of those concerns, defendant's argument must fail. Even assuming some basis existed for counsel to investigate whether defendant suffered from a disturbed psyche, the fact that counsel did not do so was not unreasonable given the circumstances of this case. The defense strategy had been to bar at the outset of trial the introduction of evidence that defendant's crimes were part

of some cult ritual.... It would have been inconsistent with the strategy of barring that evidence for counsel to later argue the very same evidence showed, in the sentencing phase, that defendant's culpability was due to a disturbed psyche. The fact that counsel did not investigate sources to glean such evidence is therefore rendered strategically inconsequential ... arguing the lurid particularities of the crimes as evidence of a psyche ripe for Gecht's enslavement was inconsistent with defendant's sworn proclamations of innocence. We therefore cannot conclude counsel's representation fell below the level of constitutional effectiveness. *See Strickland [v. Washington]*, 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052....

*People v. Kokoraleis*, 159 Ill.2d at 329–31, 202 Ill.Dec. at 282, 637 N.E.2d at 1018.

 This decision is a reasonable one in light of the precedents of the Supreme Court of the United States and consistent with the facts and circumstances of the case. In light of 28 U.S.C. § 2254(d) the decision must stand against the petition for habeas corpus.

The decision would stand even without the newly passed § 2254(d).

The petitioner relies principally on the opinion of Dr. Ronald Miller, a Board Certified Psychiatrist, who appears to have an appropriate degree of expertise in forensic analysis at least under currently prevailing law which accepts such testimony as sufficiently expert to justify the admissibility of opinion evidence on the question of mental state. Dr. Miller does conclude that Kokoraleis suffers from Borderline Personality Disorder and that he had a repressed anger

against women (because, by dying when he was 12, his mother abandoned him) and these things allowed Gecht's own anger at women to trigger Kokoraleis' anger so that he lacked adequate self-control when he kidnaped, raped and murdered. Dr. Miller is careful enough to tell us the factual basis for this opinion, and it is not rooted in petitioner's own account of the crimes because the petitioner cannot "accept what he did." Instead, Dr. Miller made certain assumptions, he reached his opinion by "accepting the premise that he did in fact commit the crimes to which he confessed and that Robin Gecht did in fact have the type of emotional and psychological influence over [him] which has been described by his sister and landlord."

There are troubling aspects to this reasoning. First and foremost is that the murder of Lori Borowski was committed outside the presence of Robin Gecht and not at his orders, at least as Kokoraleis recounted the crime. The same is true of the murder of Shui Mak.[4] Second is that there is still no account of the dynamics of the relationship in the conduct of the crimes; that is, specifically how the relationship contributed to the crime as it was committed.[5] The only statements of the sister and landlord are their *conclusions* that Kokoraleis was under the sway of Gecht. Ordinarily an opinion of this sort by a lay witness is of no value without some supporting fact basis. What the landlord and sister tell us is no more than what is routinely heard from people who learn that someone they know and liked committed a terrible crime, i.e., "I don't know why this happened, someone or something must have caused him to go awry."[6]

---

**4.** Kokoraleis' version is not the only one in the reported cases. Spreitzer confessed that he and Gecht (not Kokoraleis) murdered Borowski and Mak. Interestingly, Spreitzer did get on the witness stand to account for his crimes in terms of his desire to keep his job with Gecht and continue learning a trade. *People v. Spreitzer*, 123 Ill.2d at 33, 121 Ill.Dec. at 237, 525 N.E.2d at 43.

**5.** Proving the dynamics would be very difficult if the evidence was confined to the facts in Kokoraleis' confessions. There are very few details showing more than Gecht (when present) directed most of the activities. The truth of these confessions was disputed by petitioner. There was apparently no possibility that either Gecht or

Spreitzer was going to testify and petitioner does not criticize his trial counsel for not calling Thomas Kokoraleis as a witness, assuming his availability.

**6.** Dr. Miller might have been able to make a better case if Kokoraleis' testimony or even his confessions had more closely resembled those of his brother, Thomas Kokoraleis, who described Gecht as a true cult leader who had an altar with a human breast on it, who collected breasts and told his disciples what to do and committed unspeakable sex acts. But this is precisely the type of evidence that trial counsel sought to keep out of this petitioner's prosecution, a decision which is not criticized here.

This mitigation was inconsistent with the defense, a fact which petitioner regards as trivial but it is not. Defense counsel, who changes course from the guilt phase to the sentencing phase, runs the risk that his arguments will be treated as incredible. Most defense counsel who offer a defense on the merits exercise care in constructing mitigation arguments. There is nothing incredible about telling a jury that the prosecution did not prove its case beyond a reasonable doubt and then later giving the jury a mitigating account of the offense. Counsel can insist on proof beyond a reasonable doubt and then seek to mitigate the offense. The nature of credible mitigation is, however, often circumscribed by the nature of the defense.

 In this case the defense was a sworn denial of the offense by petitioner. Petitioner does not criticize the decision to do this nor does he say he was unwilling to deny the offense or that the denial was untrue. This was not a case in which the defendant never took the witness stand and thus preserved his option to take a different course in mitigation. Having testified as he did, he cannot claim ineffectiveness of counsel on the basis of failure to put in or even consider the mental condition mitigation that he now claims would be to his benefit. It is true that trial counsel now says that he would have used Dr. Miller if he had his opinion at the time of trial. I am reluctant to give any weight to this statement. Looking backward, any lawyer could see that the strategy he used did not work. This is true in every' one of the cases in which incompetency of counsel is alleged; in all cases the chosen strategy did not work. Any lawyer would be inclined to say that he or she would have tried something else. And trial counsel does not say how he would have proved what it was that Dr. Miller simply assumed and how any lawyer could credibly argue this form of mitigation after his client had sworn its factual basis was untrue.

The petitioner cites precedent from other circuits. But these cases, only one of which has binding authority upon this Court, are distinguishable on numerous grounds. First, in most of these cases the petitioners had demonstrated substantial psychiatric histo-ries. *Brewer v. Aiken,* 935 F.2d 850 (7th Cir.1991) (petitioner received shock therapy as a child, suffered severe blows to the head and brain damage, and had a low IQ); *People v. Perez,* 148 Ill.2d 168, 170 Ill.Dec. 304, 592 N.E.2d 984 (1992) (petitioner suffered mental handicap and relevant information was available to counsel but he failed to present it); *Cunningham v. Zant,* 928 F.2d 1006 (11th Cir.1991) (petitioner suffered from a head injury leading to surgical placement of metal plate in his head and mild retardation); *Evans v. Lewis,* 855 F.2d 631 (9th Cir.1988) (petitioner diagnosed as schizophrenic and available documents which counsel ignored showed a history of mental problems); *Middleton v. Dugger,* 849 F.2d 491 (11th Cir.1988) (petitioner diagnosed as schizophrenic, had low I.Q. and suffered physical and mental abuse as a child); *Thomas v. Kemp,* 796 F.2d 1322 (11th Cir. 1986) (petitioner suffered from major mental illness and mental and physical abuse as a child). In each of these cases, unlike Kokoraleis, available evidence showed that each petitioner had a documented history of psychological problems that counsel entirely failed to investigate or present at sentencing. Second, in a majority of the cases, defense counsel presented no mitigation evidence at all. *Brewer,* 935 F.2d 850; *Horton v. Zant,* 941 F.2d 1449 (11th Cir.1991); *Evans,* 855 F.2d 631; *Middleton,* 849 F.2d 491; *Thomas,* 796 F.2d 1322. Third, the precedents for the other circuits are not useful here, most of these opinions failed to consider the question of how defense counsel could connect mental condition mitigating evidence to the crime, concluding instead, without reason or explanation, that mental evidence might have resulted in different outcomes. These examples of ipse dixit are not persuasive here. Finally, another case petitioner cites, *Armstrong v. Dugger,* 833 F.2d 1430 (11th Cir. 1987), is an anomaly. The court found counsel who had been a member of the bar for eight weeks when he defended his client constitutionally ineffective, and there is no mention in the opinion as to what type of evidence might otherwise have been offered in mitigation. Here, Kokoraleis failed to present a history of psychological problems warranting investigation and no documenta-

tion of one existed. Counsel presented mitigating evidence to the extent he thought reasonable strategically and in light of the facts.

Finally the petitioner offers the expert opinion evidence of Leonard Kaplan, a professor of law at a distinguished university who is also possessed of a doctorate in psychology. He opines that petitioner's counsel gave ineffective representation to his client at sentencing. The basis for this opinion is his reading of various materials about the defense of death penalty prosecutions, the papers in this case, statutes and reports of cases. There is no reason to accept Professor Kaplan as an expert; from all that I can see, he is not. His resume shows no experience in the defense of criminal cases, let alone capital cases, nor is he the author of any published scholarly studies of capital case defense. He has a law degree and a psychology doctorate which might lead him to interesting insights on this case and others, but he is no more expert than any of the lawyers in this case, and the basis for his opinion is less artfully and fully expressed than the arguments offered by petitioner's counsel here. With one exception,[7] Professor Kaplan offers merely a conclusion which I paraphrase: "I have read all these materials and I am who I am and I say the failure to investigate extreme emotional disturbance

was a harmful deviation from the standard professional norm in representing a defendant in a capital sentencing, that the primary strategy to argue reasonable doubt was not a reasonable tactical decision and more should have been done to explain the aggravating factors." I know why petitioner's counsel thinks this is so, but I do not know why Professor Kaplan thinks this is so, and he is the expert on which petitioner asks me to rely. Neither Professor Kaplan nor petitioner's counsel speak in anything but abstract terms about how the unused mitigation evidence would actually play to a jury. There is no suggestion of how it could be effectively presented and no sample of what an effective closing argument would look like. There is nothing wrong with opinions of courts which tell us that, in general, extreme emotional conditions are effective mitigation, but counsel ought to tell us how it would be effective in the particular case before the court, and counsel here do not do so in a meaningful way.

What petitioner offers as expert testimony is entitled to no weight.

Reading the opinion evidence in this case also suggests the wisdom of an approach offered by Ronald J. Allen and Joseph S. Miller in *The Common Law Theory of Experts: Deference or Education,* 87 Nw. U.L.Rev. 1131 (1993) and discussed again in

7. The one exception is his statement that he "considered the fact that at least two individuals received the death penalty without offering such explanatory mitigating evidence as extreme emotional disturbance, but on remand received a sentence less than death when evidence of extreme disturbance was offered at the sentencing hearing." He then cites the cases of *Yates* and *Burchette.* Even here there is no reasoned conclusion, just the simple assertion that there was this difference and it had an effect. This might be so if the first and second hearings in those cases were otherwise essentially similar and it might even have some meaning for this case if those trials were essentially the same as this one. There is almost never an exact match among any except the most simple kinds of cases but lessons may be learned from other trials. Perhaps Professor Kaplan offered no detailed analysis because the comparisons to this case do not work very well. In the reported case of *People v. Yates,* 98 Ill.2d 502, 75 Ill.Dec. 188, 456 N.E.2d 1369 (1983), it does not appear that Yates ever took the stand to deny his guilt and render a mental condition argument inconsistent with his

defense on the merits. Moreover, his first death penalty was reversed because of an argument so clearly prejudicial and improper that a new hearing was required. Presumably the argument was not repeated the second time around. In *People v. Burchette,* 257 Ill.App.3d 641, 195 Ill.Dec. 550, 628 N.E.2d 1014 (1st Dist.1993), the defendant there confessed and did not offer sworn testimony of his innocence, so it was not inconsistent to claim extreme emotional condition at the time of the crime. There is also the significant difference between *Yates* and *Burchette* whose criminal acts each occurred at one time and place, as opposed to Kokoraleis who had to argue to a jury that his extreme emotional condition existed over a much longer period of time, at least several months. The state court judge commented on this when he noted "it is difficult to comprehend the allegation of extreme emotional disturbance when we have a murder ... on May 15, 1982 and other murders ... occurring May ... 1981 through September 7, 1982 so it appears that is a rather extensive period for the umbrella of emotional disturbance [to cover]."

Ronald J. Allen, *Expertise and the Daubert Decision*, 84 J.Crim. L. & Criminology 1157 (1984).

These two articles dealt with competing models of expert testimony, the deferential and the educational. In the first the fact finder hears an expert express an opinion and after considering credentials, demeanor and how well the expert defended the opinion decides whether to accept the opinion. If there are two experts with differing opinions, the judge or jury may simply decide which one to believe. At the core, the decision is essentially whether to defer to an opinion and the decision takes this form because the fact finder simply lacks the knowledge to judge which opinion is true. This does not always have to be. A jury could be taught what it needs to know so that it could form its own judgment. Something like this happens sometimes in patent cases where counsel begin with the principle of the ramp and end with exotic devices to transfer weight from a to b. And something like this happened for many years when experts would explain trade practice and custom so that a fact finder could decide whether the words and acts in question made a certain contract. But consider translation of a foreign language. You could teach a jury (or at least some of them) to speak Urdu. It might even be worth the expenditure of a year or so by twelve jurors or a single judge and their teachers if the decision of the case were extremely important and the crucial evidence was in Urdu. After all, we spend months and sometimes years trying cases as it stands now. But neither the bench nor the bar has given much thought to this translation practice, in no small part because crucial cases involving disputed translations of Urdu or even French do not come along that often.

Things have changed in recent years. The language problem has expanded and not merely because world commerce brings more languages into our courts. Rather, there are dozens of areas of scientific and technical expertise, and those who offer such testimony often speak in the functional equivalent of Urdu, and translation is impossible without understanding some principles of the relevant science. There is no substantial counter-argument to the proposition that it would be wise to educate the fact finder instead of merely asking experts to state their conclusions and hoping the expert picks the right one. As Professor Allen notes

The real objection to this argument [that experts ought to educate the jury rather than simply pronounce] is not that it is wrong; the real objection is that it would be too costly. I certainly agree that educating jurors adequately to decide intelligently cases with complicated issues would be costly. In many instances, the jurors would literally have to go to school, or at least have the school brought to them. One can easily imagine cases that would require months of instruction before jurors would be competent to decide intelligently. It is, however, much more difficult to find cases that would defy this educational process, which brings us full circle.

But the circle produces a paradox. There are many cases that do not involve scientific or technical questions but do require months of instruction so that the jury can understand them. In these cases we do not permit juror deference to juridical outsiders such as experts; we require the parties to connect the case through evidence to the experience of the jurors. Why, then, do we flirt with, and perhaps adopt, a more deferential mode when something comes into court labeled "expert testimony"? If I am right, the cognitive questions are highly similar, even if not identical, in both sets of cases. The economic questions are truly identical. In all cases, parties must take into account the costs of presenting their cases, and responding to their opponents' cases, in determining their optimal strategy. This variable is independent of the conventional/expert distinction. The economics of public subsidy are also highly analogous if not identical. All trials have public subsidies, such as the cost of the courthouse and various governmental salaries. From the public point of view, a subsidy to a six-month trial that involved educating the jury about calculus is no different from the subsidy to a six-month bank fraud trial. If there is a difference, it favors the subsidy in support of the instruction in calculus, as

that might lead to social benefits that are very difficult to see flowing from the educational effort directed toward the jury in a bank fraud case.

See 84 J.Crim. L. & Criminology at 1160–61.

The Supreme Court did not directly address the issue of deference to experts in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), but it did discard the old test which found admissibility to depend on general acceptance with the relevant scientific community. That test affirmatively encouraged deference, indeed the decision required only a determination of what was accepted and judicial deference to that which was accepted. The discarding of the old test was not complete, and one could argue, as Professor Allen does, that the new test is a mere rephrasing of the old rule along with a conversion of an absolute rule into a guideline.[8] Under *Daubert*, I am to consider, roughly stated, whether a scientific theory can be (and has been) tested[9], whether it has been subjected to peer review and publication, whether it does have general acceptance, and whether the particular science has a potential or known unacceptable rate of error. *Daubert*, 509 U.S. at 593, 113 S.Ct. at 2796–2797. These considerations seem to be non-exclusive and to be applied flexibly.

It is my view that under *Daubert*, it will be difficult, if not impossible, to determine either the first or fourth of its standards unless, at the threshold of admissibility, the basis of the scientific or technical expertise is understandable to the court. Professor Allen criticized *Daubert* saying,

> The Supreme Court did not take its opportunity to tell trial judges to admit purported expertise only if the basis of the expertise were understandable, as it could and should have done. Trial judges will thus continue to look for a justification to defer to expertise, and they will continue to find it in the general acceptance of that expertise in generally accepted bodies of knowledge.

See 84 J.Crim. L. & Criminology at 1174.

His criticism may be well taken, but I think that *Daubert* did instruct me that general acceptance is not enough and, implicitly, that something beyond the deference model is required.

What does this mean for this case? I have already analyzed the helpfulness of the opinions of Dr. Miller and Professor Kaplan assuming that their opinions were admissible under *Daubert*, and I found they were not at all persuasive on their own terms, I made this analysis because respondent did not object on *Daubert* grounds. Had *Daubert* objections been made, I doubt that they could have been overcome in the case of Professor Kaplan.

Nothing that Professor Kaplan offers is testable, none of it has been the subject of peer review and the error rate is unknown. What might exist is general acceptance because courts do accept the opinions of some lawyers regarding the malpractice of other lawyers. Perhaps this is enough. Malpractice may be judged like food or perfume,

---

**8.** "The change from the language of rules to that of guidelines is probably positive, although not dramatically so. It reduces the hiding places for judges and will force them to focus somewhat more explicitly on whether proffered testimony will be helpful, which is to the good." 84 J.Crim. L. & Criminology at 1169.

**9.** Professor Allen disapproves of this test as an anachronism based on the philosophy of science of Karl Popper. He thinks Thomas Kuhn's philosophy is better. If I had to choose between Popper and Kuhn, I would pick Popper despite his flaws and so would nearly all scientists. I also find value in the work of the man who taught me logic. See Dudley Shapere, *Reason and Its Search for Knowledge* (1979). But the point may not have much practical consequence.

The science in most courtrooms does not vary with what Kuhn would think of as a prevailing paradigm. The physics we use in courtrooms often operates on principles understood by the Egyptians, and we seldom have to concern ourselves with anything beyond Newton's physics, though it is possible that we may have to deal someday with black body radiation or the constant speed of light. In any event I do not understand Kuhn to take the position that the testing of hypotheses is anything other than a good idea, it is, in part, the impossibility of vigorous implementation of that principle that troubled Kuhn. Compare Karl Popper, *Objective Knowledge: An Evolutionary Approach* (1972) with Kuhn, *The Structure of Scientific Revolutions* (1970).

there are people who make their living as "noses" and others as "palates" and can tell the rest of us what smells or tastes best. If this is the case then we would insist on long experience and a demonstrated track record before we accepted one person's expertise and, in the end, the final judgment of smell and taste would be made by the fact finder who can experience it directly. Here Professor Kaplan does not have the track record, and my final judgment would be that there was no incompetence of counsel.

There seems to be no cost barrier to requiring a legal malpractice expert in habeas corpus to follow the education model of expert testimony, neither a new technical language nor an unfamiliar subject must be taught from scratch. Lawyers testifying as experts on competency of counsel (or, for that matter, on most patent issues) before judicial fact finders ought to be held to the requirements of the education model and not the deference model.

Dr. Miller works in a field in which there are large areas of untestability. It may be the psychiatric opinion based upon non-organic conditions does not in the end qualify under *Daubert.* Yet there will be publication and peer review, so a case for general acceptance can be made and there could be studies of error rates. Psychiatric evidence has a long history of admission though its admissibility originally could not have been based upon its status as expert opinion, this is so because the common law recognized that anyone could give an opinion as to sanity. *See, e.g., People v. Hollins,* 136 Ill.App.3d 1, 5, 90 Ill.Dec. 770, 773, 482 N.E.2d 1053, 1056 (2d Dist.1985) (defense may introduce lay opinion testimony on issue of sanity); *People v. Teague,* 108 Ill.App.3d 891, 905, 64 Ill.Dec. 401, 411, 439 N.E.2d 1066, 1076 (1st Dist. 1982) (lay opinion sufficient to support jury decision); *Gambill v. State,* 675 N.E.2d 668, 672 (Ind.1996) (jury may consider lay opinion on issue of sanity); *Arnold's Trial,* 16 How. St. Trials 706 (1724). A case could be made that *Daubert* requires a wholesale reevaluation of the admissibility of this form of opinion evidence given the absence of testability but this is not the place to make it since the opinion, even if admissible, does not establish anything of value to the petitioner here. I also decline to determine whether cost considerations would bar use of the education model for forensic testimony of this sort. I suspect they would not, for in murder cases one side or the other usually follows the education model as a counterweight to the deference theme played by the adversary. Since the cost of educating the jury is to be borne by someone, it should be borne, in the first instance, by the proponent of the psychiatric explanation of conduct. Even if this were to increase costs, the use of an education model for psychiatric experts would probably be worth the added expense to increase the validity of verdicts. I do not decide the question here because it is both unnecessary to the decision and more difficult to decide than the case of the lawyer testifying as an expert. Even accepting Dr. Miller's conclusions as admissible under *Daubert,* they cannot for the reasons I have given, lead to a conclusion that trial counsel was incompetent.

The petition for a writ of habeas corpus is denied.